# Supreme Court of Texas

No. 24-0883

In re Bell Helicopter Services Inc. and Bell Helicopter Textron Inc.,

*Relators*

On Petition for Writ of Mandamus

**Argued December 3, 2025**

CHIEF JUSTICE BLACKLOCK delivered the opinion of the Court.

The federal General Aviation Revitalization Act (GARA) provides that "no civil action for damages for death or injury . . . arising out of an accident involving a general aviation aircraft may be brought against the manufacturer" more than 18 years after the manufacturer delivers the aircraft to its first purchaser. General Aviation Revitalization Act of 1994, Pub. L. No. 103-298, §§ 2(a), 3(3), 108 Stat. 1552, 1552–53 (codified at 49 U.S.C. § 40101 note). If, however, a manufacturer replaces or adds a "new" part, and that part is later "alleged to have caused" the accident, then the clock runs from the date of the "replacement or addition." *Id.* § 2(a)(2), 108 Stat. at 1552.

This case involves a helicopter manufactured and delivered in 1997. Twenty years later, an engine panel original to the aircraft came

loose and caused the helicopter to crash, killing the pilot. The pilot's family sued the manufacturer. They claim the aircraft's flight manual failed to adequately warn about the dangers of flying with a loose panel. The defendants contend that GARA bars the suit. The plaintiffs respond that the 18-year clock restarted because the manufacturer revised the flight manual several times in the years before the crash.

We conclude that Congress has barred this suit. GARA's 18-year clock restarts only when a "new" part is "alleged to have caused" the accident. *Id.* None of the revisions to the manual on which the plaintiffs rely fits that description. The alleged defect in the manual has not changed since the helicopter was delivered in 1997, and the continued omission of the disputed warning across subsequent versions of the manual does not amount to a new part that restarts the 18-year clock. Because nothing the manufacturer changed about the aircraft or its manual in the 18 years before the accident is alleged to have caused the accident, GARA bars the claim.

As in prior cases, mandamus relief from the legally erroneous denial of summary judgment is available to end a lawsuit when Congress has determined that no such suit "may be brought." *In re Academy, Ltd.*, 625 S.W.3d 19 (Tex. 2021); *In re Facebook, Inc.*, 625 S.W.3d 80 (Tex. 2021) (Rule 91a). That is again the case here. The petition for writ of mandamus is conditionally granted.

## I.

The helicopter in question was manufactured in 1997 by Bell Helicopter Textron Inc. and was delivered to its first purchaser that

2

same year.[1] The aircraft eventually made its way to Westwind Helicopters, Inc., which used it to transport workers to and from offshore oil platforms.

Matthew Kawamura was one of Westwind's pilots. On February 27, 2017, Kawamura flew a crew to an offshore platform in the Gulf of Mexico. After landing, he discovered that the left-side engine cowling—a hinged panel covering the engine compartment—had come loose. Two of the fasteners that held it in place were damaged. Kawamura reported the problem to Westwind. Westwind initially agreed to send a mechanic, but because no mechanic was readily available, Kawamura was directed to "chance it coming in for repairs." Westwind told him to fly alone. During the flight, the loose cowling allegedly detached from the aircraft, struck the tail rotor, and sent the helicopter into an uncontrollable descent. Kawamura died in the crash.

Kawamura's family sued Bell and Westwind in October 2017. Bell answered that the claims against it were "barred by the provisions of the General Aviation Revitalization Act of 1994." The case then stalled for several years pending investigations and inspections.

In February 2024, the plaintiffs produced expert reports that, for the first time, suggested a theory of Bell's liability, notwithstanding GARA, for the failure of the twenty-year-old aircraft. The theory focused not on any mechanical defect—the engine cowling and its fasteners were original to the aircraft—but on the flight manual. The helicopter came

---

[1] "Bell Helicopter Textron Inc." is listed on the manufacturing documents. The family also sued Bell Helicopter Services Inc. We refer to the defendants collectively as Bell.

3

with a flight manual that includes a preflight checklist. The checklist instructs pilots to confirm, among other things, that the left-side "Engine cowling" is "Secured." But according to the plaintiffs, that instruction was not enough. The manual should have also included an explicit warning that failing to follow the instruction could be dangerous, as it does for other items like removing the rotor tie-downs. With that warning, the theory goes, Westwind would have grasped the life-threatening danger of a loose cowling before instructing Kawamura to fly.

Bell moved for summary judgment based on GARA, under which "no civil action for damages for death or injury to persons . . . may be brought against the manufacturer" more than 18 years after the manufacturer's initial delivery of the aircraft. GARA § 2(a), 108 Stat. at 1552. The plaintiffs responded that the 18-year period had restarted because Bell revised the flight manual several times in the years before the crash.

The parties' dispute under GARA turns on the revision history of the flight manual, specifically the preflight-check subsection. Bell first issued the manual in 1996 and has since revised it periodically. Between 2002 and 2016, Bell made fifteen sets of revisions to the manual, including the following four revisions to the preflight-check subsection: a 2011 revision to a graphic depicting the preflight sequence; a non-substantive 2011 revision to the left-side fuselage check;[2] a 2013

_____

[2] Per the manual: "A revised page with only a vertical line next to the page number indicates that text has shifted or that non-technical correction(s) were made on that page." The unspecified revision to the left-side fuselage

4

revision to the oil-level check; and a 2013 revision to the combustion-case check. It is undisputed that none of these revisions had anything to do with the left-side engine cowling alleged to have caused the crash.

Three more material facts about the manual are undisputed. First, every version of the preflight-check subsection has included the same instruction about checking the left-side engine cowling: "k. Engine cowling — Secured." Second, no version has ever included an additional warning against flying with a loose cowling. As the plaintiffs put it in a summary judgment response below: "The Flight Manual was defective when it left Bell's facilities because it lacked a warning that the helicopter should not be flown when the access door and/or engine cowling are not secured." "While the Flight Manual has undergone various revisions since it was originally issued," the filing continues, the instruction about "the engine cowling being secured ha[s] not undergone revisions." Third, Bell has not added or replaced any relevant mechanical component, so the analysis under GARA focuses exclusively on the flight manual.

The district court denied Bell's summary judgment motion without explanation. Bell sought mandamus relief in the court of appeals, which denied relief without a substantive opinion. 719 S.W.3d 398, 399 (Tex. App.—Houston [14th Dist.] 2024).

---

check—the portion encompassing the engine-cowling instruction—is indicated with a vertical line next to the page number.

5

**II.**

**A.**

Though couched as a "limitation period," §§ 2(a), 3(3), GARA operates as a "classic statute of repose" by barring claims that arise too long after a fixed date. *Lyon v. Agusta S.P.A.*, 252 F.3d 1078, 1084 (9th Cir. 2001). The statute sets the fixed date as the manufacturer's delivery of the aircraft, and it sets the repose period at 18 years. After that period, "no civil action for [personal injury] . . . arising out of an accident involving a general aviation aircraft may be brought against the manufacturer . . . in its capacity as a manufacturer." GARA § 2(a), 108 Stat. at 1552. The relevant statutory text provides:

> (a) . . . . no civil action for damages for death or injury to persons or damage to property arising out of an accident involving a general aviation aircraft may be brought against the manufacturer of the aircraft . . . in its capacity as a manufacturer if the accident occurred—
>
> (1) after the applicable limitation period beginning on [the date of relevant delivery] . . . .
>
> . . . .
>
> (3) the term "limitation period" means 18 years with respect to general aviation aircraft and the components, systems, subassemblies, and other parts of such aircraft . . . .

*Id.* §§ 2(a), 3(3), 108 Stat. at 1552–53.

The statute also provides that if a manufacturer replaces or adds a new part, a fresh 18-year period begins for that part—but only if the part "is alleged to have caused" the accident. *Id.* § 2(a)(2), 108 Stat. at 1552. Under this provision, no civil action may be brought if the accident occurred

6

(2) with respect to any new component, system, subassembly, or other part which replaced another component, system, subassembly, or other part originally in, or which was added to, the aircraft, and which is alleged to have caused such death, injury, or damage, after the applicable limitation period beginning on the date of completion of the replacement or addition.

*Id.* This is often called GARA's "rolling provision." *E.g.*, *Caldwell v. Enstrom Helicopter Corp.*, 230 F.3d 1155, 1156 (9th Cir. 2000).

GARA "supersedes any State law to the extent that such law permits a civil action described in subsection (a) to be brought after the applicable limitation period for such civil action." GARA § 2(d), 108 Stat. at 1553. The statute contains other limitations and exceptions, but none is relevant here. *See id.* § 2(b)(1)–(4), 108 Stat. at 1552–53.

**B.**

We begin with what is undisputed. This is a "civil action for damages for death . . . arising out of an accident involving a general aviation aircraft." *Id.* § 2(a), 108 Stat. at 1552. Bell delivered the aircraft to its first purchaser in 1997. The accident happened in 2017, twenty years later. Thus, unless GARA's 18-year clock was reset under the rolling provision, "no civil action [like this one] . . . may be brought." *Id.* No one contends that the clock restarted because of any change to the engine cowling itself—the physical component that came loose and allegedly caused the crash. That part was original to the aircraft.

7

The plaintiffs' theory of liability rests instead on a different "part" of the aircraft: the flight manual.[3] The theory is that the manual's preflight checklist—a list of things to check before flying—was deficient because, although it told pilots to confirm that the engine cowling was secured, it did not also warn them not to fly if the cowling was not secured. Because Bell revised the preflight checklist several times in the years before the accident (though never the cowling instruction), the plaintiffs contend the 18-year clock was reset under GARA's rolling provision. As explained below, we disagree.

In an effort to trigger the rolling provision, the plaintiffs point to several revisions Bell made to the preflight-check subsection of the flight manual in the years before the accident: a 2011 revision to the preflight-check graphic, a non-substantive 2011 revision to the left-side fuselage check, a 2013 revision to the instruction for checking the transmission's oil level, and a 2013 revision to the instruction for checking the combustion case. The theory is that the preflight-check subsection as a whole was "replaced" by a "new" subsection containing these revisions.

_____

[3] Bell does not dispute that the flight manual qualifies as a "component, system, subassembly, or other part" of the aircraft. For many readers of the statute, the words "component, system, subassembly, or other part" may bring to mind the physical, mechanical elements of the aircraft itself but not necessarily the content of the written instructions accompanying the aircraft. Nevertheless, the federal courts have largely accepted the notion of a flight manual as an aircraft "part." *See, e.g.*, *Caldwell*, 230 F.3d at 1157; *Lyon*, 252 F.3d at 1088; *Crouch v. Honeywell Int'l, Inc.*, 720 F.3d 333, 341–43 (6th Cir. 2013). Although we are not required to follow the precedent of federal courts of appeals on the meaning of a federal statute, we need not explore the question here because it is not in dispute. We will accept, for purposes of this opinion, the parties' shared premise that the flight manual should be treated as one of the aircraft's "parts" under GARA.

This new, replacement subsection—still lacking an adequate warning, as it had all along—is what is "alleged to have caused" the accident. The rolling provision therefore applies, as the plaintiffs see it, and the repose period must be calculated from the latest revision to the manual, not from the initial delivery of the aircraft.

An implicit premise of this argument is that we should treat the preflight-check subsection—or perhaps the whole manual—as a single, undifferentiated "part" or "system," such that revising *anything* within it restarts the clock for *everything* within it. In other words, if the plaintiffs are correct, then changing one sentence in the manual does not merely replace that sentence; it replaces the entire manual, or at least the entire section of the manual containing the sentence. We do not understand the rolling provision to operate that way. Nor has any other state or federal court.

To begin with, GARA's text asks whether a "new component, system, subassembly, or other part" has replaced another and is "alleged to have caused" the harm. GARA § 2(a)(2), 108 Stat. at 1552. The statute thus requires identifying the specific "component, system, subassembly, or other part" that is both "new" and "alleged to have caused" the injury. It does not permit the plaintiff to point to a collection or category of parts, some of which are "new" and some *other of which* is "alleged to have caused" the injury.

The text makes this conclusion unavoidable, we think. Start with the enumeration of what must be replaced. Congress did not simply say "part"; it listed "component, system, subassembly, or other part"—terms that reflect different levels of specificity in how machines are organized.

9

To "replace" is "to put something new in the place of" something else, "esp[ecially] as a substitute or successor." *Replace*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1994). Thus, a new component takes the place of the old component; a new system substitutes for the old system; a new part replaces the old part; and so on. Replacing one small part of a larger component or system does not replace the entire component or system containing the part. A new bolt merely replaces an old bolt. It does not yield a new engine that replaces the old engine. In other words, as one court put it, the rolling provision's text leaves "no room to argue that replacement of a few parts of a larger system starts the rolling limitation period anew for all parts in the larger system." *Hiser v. Bell Helicopter Textron Inc.*, 4 Cal. Rptr. 3d 249, 257 (Ct. App. 2003).

Given the text, it is perhaps unsurprising that this demand for particularity—identifying the specific part that is both new and allegedly at fault—is a consistent theme in the GARA caselaw, for manuals and machinery alike. As the Michigan Court of Appeals aptly put it, GARA caselaw "focuses on the component that allegedly caused the crash, not the larger part that encompasses many smaller components, one of which was the allegedly deficient component." *Hinkle v. Cessna Aircraft Co.*, No. 247099, 2004 WL 2413768, at *8 (Mich. Ct. App. Oct. 28, 2004) (collecting cases); *see also Pridgen v. Parker Hannifin Corp.*, 916 A.2d 619, 623 n.3 (Pa. 2007) ("[O]ther jurisdictions have also reasoned that GARA's period of repose is not displaced with respect to entire aircraft systems . . . by the replacement of component parts of such system." (collecting cases)).

10

The Ninth Circuit's decision in *Caldwell* is instructive. 230 F.3d 1155. There, a helicopter crashed after running out of usable fuel. *Id.* at 1156. The plaintiffs alleged that the flight manual was defective because it failed to warn that the last two gallons of gas in the tank could not be used. *Id.* The manufacturer revised the manual several times over the years, and the plaintiffs argued that those revisions rendered the entire manual a "new" system or part under the rolling provision. *Id.*

As discussed above, the Ninth Circuit accepted the proposition, uncontested here, that a revised flight manual could qualify as an aircraft "part." *Id.* at 1157. As the court then explained, "if [the manufacturer] substantively altered, or deleted, a warning about the [allegedly defective part] from the manual within the last 18 years, and it is alleged that the revision or omission is the proximate cause of the accident, then GARA does not bar the action." *Id.* at 1158. But a "revision to the manual does not implicate GARA's rolling provision . . . unless the revised part 'is alleged to have caused [the] death, injury, or damage.'" *Id.* (quoting GARA § 2(a)(2), 108 Stat. at 1552). So revisions to unrelated parts of the manual do not trigger the rolling provision. *Id.* The court illustrated the point with an analogy: "Just as the installation of a new rotor blade does not start the 18-year period of repose anew for purposes of an action for damages due to a faulty fuel system, a revision to any part of the manual except that which describes the fuel system would be irrelevant here." *Id.* The court thus remanded with the instruction that "[i]f, within the last 18 years, [the manufacturer] substantively revised, or deleted, the instructions in

11

the flight manual that describe or warn about the fuel tanks, and if Plaintiffs allege that *those revisions or deletions* caused the deaths, injuries, and damage at issue, then Plaintiffs can state a claim." *Id.* (emphasis added).

The Sixth Circuit's 2013 decision in *Crouch v. Honeywell International, Inc.* is similarly persuasive. 720 F.3d 333. A plane crashed after a part detached from the engine; the plaintiffs alleged that the manual was defective because it failed to warn that the part might come loose. *Id.* at 336. The manufacturer had revised the manual several times, including as recently as four years before the accident. *Id.* at 336, 342. But the plaintiffs could not point to any specific revision that bore on the alleged defect. *Id.* at 341–43. Instead, their theory, like the one advanced here, was one of continued omission: the manual had never contained the warning they said it should have, and no revision ever changed that.

The Sixth Circuit held that this was fatal to the claim. The rolling provision, the court explained, requires a "causal nexus between the replaced part and the complained of injuries"; absent that causal connection, the rolling provision "does not operate to trigger a new period of repose." *Id.* at 343. For example, the rolling provision "cannot be reasonably construed as meaning that the 18-year period of repose for the entire engine is reset every time a single sub-part is replaced." *Id.* Applying this logic to manuals, the court held that "the facts must show (1) that [the manufacturer] made a substantive change in (i.e., alteration of or deletion from) the [manual] instructions relating to [the allegedly defective component], and (2) that the change was the

12

proximate cause of the crash." *Id.* The plaintiffs' theory—that the manual should have contained a warning that it had never included—did not satisfy that standard. *Id.*

*Hiser v. Bell Helicopter Textron Inc.* confirms the point in the context of physical components. 4 Cal. Rptr. 3d 249. The plaintiffs argued that modifications to a helicopter's fuel-transfer system—relocating some components, replacing others—should restart the clock for the entire system. *Id.* at 255–56. The court rejected the argument based on the rolling provision's text. "[T]he fuel transfer system was not entirely replaced," the court explained; "[i]t was redesigned and modified by the relocation and replacement of fewer than all components." *Id.* at 257. And because "replacement" requires "two acts: removal of the old and substitution of the new," the court held that "for those parts, components, or subassemblies that have not been replaced, a new limitation period does not commence." *Id.* More generally, the court concluded, "the replacement of less than all the components of a system does not trigger a new limitation period under GARA with respect to defects in components of the system not replaced." *Id.* at 258.

The principle that emerges from these and other cases is consistent: Replacing some parts or components of a system does not restart the repose period for the entire system.[4] Under this approach,

---

[4] *See also, e.g.*, *Sheesley v. Cessna Aircraft Co.*, No. 4:02-CV-04185, 2006 WL 1084103, at *11 (D.S.D. Apr. 20, 2006) ("Teledyne only manufactured the engines, and even if the wastegate elbow is considered a component part of the engine, this does not roll the repose period applicable to the entire engine."); *La Haye v. Galvin Flying Serv., Inc.*, No. 2:01-CV-00982, slip op. at 7–8 (W.D.

which is firmly grounded in both the text of GARA and the cases applying it, the plaintiffs' theory of liability fails. The flight manual is not a single undifferentiated unit. It is organized into sections, which are divided into subsections, one of which is the preflight-check subsection—which is itself divided into different areas of the aircraft, different subareas, and ultimately into individual instructions.

The revisions the plaintiffs identify—to the preflight-check graphic, the left-side fuselage check, the transmission-oil instruction, and the combustion-case instruction—have nothing to do with the part of the manual "alleged to have caused" the accident. That part is the engine-cowling instruction, which was never revised. Revising other parts of the preflight-check subsection no more restarts the clock for the engine-cowling instruction than replacing one engine bolt restarts the clock for an accident caused by another bolt elsewhere in the engine.

Put differently, the plaintiffs must identify a "new" part that is "alleged to have caused" the accident. GARA § 2(a)(2), 108 Stat. at 1552. In this case, they can do one or the other, but not both. The engine-cowling instruction is alleged to have caused the accident. But it is not new. The revised instructions are new. But they are not alleged to have caused anything. The rolling provision does not permit a plaintiff to cobble together its claim in this way.

---

Wash. May 2, 2003) ("Congress' intent to provide repose for aircraft manufacturers would be effectively nullified, however, if plaintiffs could lump each new part into larger systems for purposes of GARA's rolling provision. If that were the case, [original parts] . . . could become the basis of a suit decades later, not because they were new or had been altered in the last 18 years, but because another part in the same system had been replaced."), *aff'd*, 144 F. App'x 631 (9th Cir. 2005).

14

The plaintiffs cite no case construing the rolling provision's text to support the level of generality and aggregation their theory demands. Courts construing the rolling provision have instead uniformly held that it requires what the plaintiffs cannot provide: identification of a specific part that is both new and alleged to have caused the harm.

Reading GARA as other courts have read it, grounded in its text, we conclude that the 18-year repose period bars the plaintiffs' claims. The 18-year clock began when Bell delivered the helicopter to its first purchaser in 1997. The accident happened in 2017, twenty years later. Nothing alleged to have happened in the interim triggered the rolling provision. Bell was therefore entitled to summary judgment.[5]

---

[5] The cases suggest an additional, related way of describing the defect in the plaintiffs' claim: An ongoing failure to warn is a pure omission that cannot validly be recast as something "new" or as having "replaced" any existing component or part of the aircraft. "Courts of other jurisdictions that have addressed claims of failure to warn asserted against a manufacturer protected by GARA have uniformly determined that GARA bars a claim for failure to warn outside the eighteen-year period." *Fletcher v. Cessna Aircraft Co.*, 991 A.2d 859, 864 (N.J. Super. Ct. App. Div. 2010) (collecting cases). In *Crouch*, for example, the Sixth Circuit observed that "[p]laintiffs find themselves in the awkward position of arguing that an *omission*, something that does not exist, should be treated as something that does exist and was added on as a replacement 'part of the aircraft.'" 720 F.3d at 343 (quoting GARA § 2(a)(2), 108 Stat. at 1552). In other words, the plaintiffs' failure-to-warn theory "ask[ed] the court to treat something that was not added as though it were something that was added and as though this fictional something caused the crash." *Id.* The court declined the invitation. *Id.* at 342; *see also Lyon*, 252 F.3d at 1088; *Schiewe v. Cessna Aircraft Co.*, 546 P.3d 234, 243 (Okla. 2024); *Tillman v. Raytheon Co.*, 430 S.W.3d 698, 708 (Ark. 2013); *Alter v. Bell Helicopter Textron, Inc.*, 944 F. Supp. 531, 541 (S.D. Tex. 1996); *Croman Corp. v. Gen. Elec. Co.*, No. 2:05-CV-00575, 2006 WL 3201099, at *5 (E.D. Cal. Nov. 2, 2006) ("Failure to warn claims are usually barred by GARA.").

## C.

The only remaining question is whether mandamus relief should issue to correct the clear error of law described above. In concluding that it should, we need not break new ground or exhaustively explore the contours of modern mandamus practice. Conditionally granting the writ in this case comports comfortably with our similar decisions in *In re Academy, Ltd.*, 625 S.W.3d 19 (Tex. 2021), and *In re Facebook, Inc.*, 625 S.W.3d 80 (Tex. 2021).

"'[M]andamus is a discretionary writ,' the availability of which depends in part on our equitable judgment as to whether mandamus relief is an 'efficient manner of resolving the dispute.'" *Facebook*, 625 S.W.3d at 86 n.2 (quoting *In re Blevins*, 480 S.W.3d 542, 544 (Tex. 2013)). As a discretionary writ, mandamus relief is never available as a pure matter of right or entitlement. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 138 (Tex. 2004). Even in two cases involving the same clear abuse of discretion, determining whether appellate remedies are adequate "depends heavily on the circumstances presented" and requires a "careful balance of jurisprudential considerations." *Id.* at 136–37. Familiar equitable principles, such as laches or clean hands, also come into play. *See, e.g.*, *Rivercenter Assocs. v. Rivera*, 858 S.W.2d 366, 367 (Tex. 1993); *Indus. Found. of the S. v. Tex. Indus. Accident Bd.*, 540 S.W.2d 668, 674 (Tex. 1976). Thus, a decision granting mandamus relief in one case does not mean mandamus will automatically issue whenever a similar right or statute is at stake.

It does not follow, however, that precedent plays no role. To the contrary, any exercise of judicial discretion should be informed by the

16

experience of the past, even when not controlled by it. In two recent decisions—*In re Academy, Ltd.* and *In re Facebook, Inc.*—we granted mandamus to enforce federal statutes that, like GARA, prescribe when civil actions "may" or "may not" be "brought." 625 S.W.3d 19; 625 S.W.3d 80. In both cases, we concluded that an ordinary appeal could not adequately preserve the rights those statutes conferred. The same is true in this case.

We have often said that "mandamus is generally unavailable when a trial court denies summary judgment." *In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 465 (Tex. 2008). Yet as both *Academy* and *Facebook* demonstrated, this generalization "is not, and cannot be, absolute." *Academy*, 625 S.W.3d at 32; *see also Facebook*, 625 S.W.3d at 86–87 (Rule 91a). Mandamus review of summary judgment decisions may, in "exceptional cases," be "essential to preserve important substantive and procedural rights from impairment or loss" and to "spare private parties and the public the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings." *Prudential*, 148 S.W.3d at 136. This is such a case.

In *Academy*, we concluded that "requiring Academy to 'proceed[] to trial—regardless of the outcome—would defeat the substantive right' granted by the [Protection of Lawful Commerce in Arms Act]." 625 S.W.3d at 35 (quoting *McAllen*, 275 S.W.3d at 465). In part because Congress had barred the action from being brought at all, an ordinary appeal did not provide an adequate remedy. *Id. Facebook*, delivered the same day, reached the same conclusion. We considered section 230 of the Communications Decency Act, which provides that "[n]o cause of

17

action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 625 S.W.3d at 83 (quoting 47 U.S.C. § 230(e)(3)). "Just as the PLCAA provides that certain actions 'may not be brought,'" we explained, "section 230 contains a materially identical instruction that '[n]o cause of action may be brought.'" *Id.* at 87. "The two provisions are indistinguishable with respect to whether they create a substantive right to be free of litigation, not just a right to be free of liability at the end of litigation." *Id.*

The same is true of GARA's statute of repose, which instructs that "*no civil action* for [personal injury] . . . arising out of an accident involving a general aviation aircraft *may be brought* against the manufacturer" after the 18-year repose period. GARA § 2(a), 108 Stat. at 1552 (emphases added). The focus is on the action itself—whether it "may be brought"—not on whether the defendant will ultimately be liable or whether the plaintiff will recover. The text is materially identical to the statutes we recognized in *Academy* and *Facebook* as conferring rights that warranted mandamus relief in the circumstances of those cases.

The plaintiffs point out that GARA's operative provision— limiting when an action "may be brought"—uses language found in many conventional statutes of limitation and that Congress may have simply intended to erect a bar to a plaintiff's ultimate recovery, not a right of the defendant to avoid litigation altogether. *Academy* and *Facebook* counsel otherwise. But GARA's preemption clause offers an additional counterpoint. The statute "supersedes any State law to the extent that such law permits a civil action . . . to be brought after the

18

applicable limitation period." GARA § 2(d), 108 Stat. at 1553. The presumption against preemption, "rooted in respect for the States as independent sovereigns," assumes that "Congress does not cavalierly pre-empt state laws." *Tarrant Reg'l Water Dist. v. Herrmann*, 569 U.S. 614, 631 n.10 (2013) (citation modified). Thus, in defining the extent to which state authority is displaced, Congress is presumed to speak carefully and deliberately. And here, Congress chose to preempt state laws that "permit" actions to be "brought," not laws that permit liability to be imposed or judgments to be entered. The preemption clause, like the substantive bar, thus seems to be concerned in part with whether litigation occurs—not merely with how it ends.

A party wrongly forced to defend an action that Congress has said may not be "brought"—and that no state law may "permit[]" to be "brought"—has suffered an "impairment or loss" of its federal rights that generally cannot be remedied by an appeal following trial and judgment in a case no Texas court should have entertained in the first place. *Prudential*, 148 S.W.3d at 136. Consistent with *Academy* and *Facebook*, we conclude that Bell lacks an adequate remedy by appeal under these circumstances. That conclusion, coupled with the clear abuse of discretion described above, makes mandamus relief appropriate in this case to correct the improper denial of summary judgment.

### III.

The petition for writ of mandamus is conditionally granted, and the district court is directed to grant Bell's motion for summary judgment. The writ will issue only if the court does not do so.

19

_____
James D. Blacklock
Chief Justice

**OPINION DELIVERED:** April 24, 2026